May it please the Court, my name is Ellen Pitcher and I represent Mr. Martinez-Rodriguez, the defendant appellate in this case. I would like to reserve 2 minutes of my time for rebuttal. For 7 days, 168 hours, Oregon law enforcement personnel unlawfully received locational information every 15 minutes from Mr. Martinez-Rodriguez's cell phone carrier. The surveillance violated his right to privacy under the recent Supreme Court cases, both United States v. Jones and Riley v. California. I didn't know that anybody was listening to it all that time, I thought not. They weren't listening, they were giving pings every 15 minutes.  According to the testimony, they were following it fairly closely, not certainly every 15 minutes. In fact, the government has put in the record their exhibit of all of the pings that went up the state of California when Mr. Martinez-Rodriguez left the Riverside area. But this just wasn't passive information that the government was using in violation of the Fourth Amendment. Once they learned that Mr. Martinez-Rodriguez was in the Riverside area, they contacted the DEA there and asked the DEA to investigate, to go out and see who was in the car where the phone was being surveilled, take pictures and verify. Counsel, can I interrupt you? Just ask a question from the standpoint of the technology that's in use here. So as I understand it, when the warrant went live, so to speak, and they were authorized to get this information, your client was already in California, right? That's correct. So what did they have, what did the officers have at their disposal to do so that they could figure out when he came back into Oregon? Didn't they need to continue to monitor the pings at least every now and then to see if he had crossed back into Oregon? So what were they supposed to do, I guess is what I'm trying to figure out. Well, I think they probably should have notified the carrier to only give them pings within the state of Oregon, which was exactly what the warrant authorized them to receive. Is the carrier supposed to monitor? Well, I can't say I'm the most technologically savvy person on earth, but they were carefully monitoring all of this information from California, which they were not supposed to receive. If they were concerned about actually following the terms of the search warrant, perhaps they should have had an intermediary looking to make sure they weren't receiving unlawfully obtained information, but they were not supposed to be getting that information under the terms of the warrant. Now, once they did receive the information that Mr. Martinez Rodriguez was making his way up Oregon, up to Oregon, they were able to, according to the record and according to the testimony of the motion to suppress, they were able to get ready five or six surveillance cars with personnel, a stop car, and a canine detection unit, all of which they were ready to use the minute Mr. Martinez Rodriguez entered into the state of Oregon. The district court made a finding that they could have a simple, same or inadequate group in a relevant place simply from the time he came into Oregon. Well, I think that's sheer speculation. Basically, these are people. There was such a finding, right? Pardon? There was such a finding. Yes, the judge did find that they would have had an adequate opportunity to track him to Salem, even if they had never received the information. But that assumes that this team was out of the ready. Because they did know he was coming to Oregon that way, that day, independently from the telephone call. I'm sorry. They did know he was going to cross over into Oregon that day from the telephone call. Well, actually, what they were told the day before was that he was already in California, I mean, in Oregon. And he told the undercover informant that he was in Oregon, which obviously wasn't true. So, I understand that the court found, and I think the problem is everyone's looking at it from the point of view of once he's in Oregon, the team is there, they could follow him, they could make the stop. But if we look at it, if they did not have that information, then at the time that they learned he was getting toward the border, they would have had to get together all of these vehicles, all of the agents involved, and then go to the appropriate place where he crossed into the state of Oregon. There are five different possible routes. Let me just jump in again. Sorry to interrupt you again. But let's say that the officers had done what you had suggested, which was to ask the carrier to alert them the very moment the first ping occurred in Oregon, right? Yes. As I understand it, the stop didn't occur until some four and a half hours later. So, why is the district court wrong to assume that if they had gotten that first ping the moment he crossed the border, that four and a half hours wasn't enough time to assemble that massive team that you described and stop him at the point where they did? Well, it's speculation that it was. I mean, I think that everybody's, that the court is thinking, well, they were at the border. They could follow him. But they wouldn't have been at the border. They would have been in Clackamas County or wherever else, and all of a sudden amassing this team heading toward a moving target. Well, first of all, they knew where he was going in Oregon, right? Well, they didn't know where he was crossing. Well, they had a pretty good guess because he was from Campy, Oregon, right? Right. But there are a number of different ways to get into Oregon. So, they didn't know he was coming up I-5 except for the fact that they were intercepting all of these pings. Okay. But at least in my experience, it's a pretty good guess. If you're going to Oregon, you're going to Route 5. But even if they were wrong, so they couldn't have gone. And I don't know where Campy is. Where's Campy? Campy is close to Portland, Your Honor. Okay. So, if you wanted to drive up to Portland, is it a good guess you'd go on Route 5? Is this a good guess? Well, like I said, there are a number of different ways to enter into Oregon. So, ultimately, he's likely to be on I-5. Okay. But, counsel, I just don't think that your argument makes any sense. You're saying that they were entitled to get the very first ping when he crossed the border. They would have known he was on I-5 at that moment. That is true. They wouldn't have even been able to get there. That is true. But at that point. So, why? Let me just ask you again. So, why, if they got a ping alerting them that he was at the border between, he was crossing between California and Oregon on I-5, right? They got that. Why is four and a half hours not enough time to do what the district court thought was feasible? You said it's total speculation, but why? I don't understand why that's true. Okay. Therein, this investigation is based in Clackamas County, which is in the Portland area. So, they would need to get these cars, and all of the agents who were involved were not necessarily based in Clackamas County. So, they are all of a sudden sending out entreaties to all of the people who end up driving these various vehicles. They testified that there were five or six different surveillance vehicles that they wanted, because they didn't want Mr. Martinez Rodriguez to catch on to the fact he was being followed. So, they had to amass all of those vehicles, get people, you know, who knows how many people are on duty. It's a logistical issue to pull together that big a team, plus the stop vehicle, plus a K-9 unit that's available. Much, much easier. They had had all of those people on any of the routes, well, any reasonable routes, which would be I-5 and maybe one other, ready to go. And if they had the wrong one, they couldn't have gotten over it in four and a half hours? I'm sorry? Suppose they had, I mean, you're assuming that all those people would not have been gotten together, knowing he was to be in Oregon that day, but they could have gotten them all together knowing he was to be in Oregon that day. Presumably, they would have. They got them all together this time. Why wouldn't they get them all together? And then, once they know what road he's on, they go there. Well, I think the burden is on the government to show that their ability to do that was so attenuated to the information that they received illegally that that dissipates the taint of the illegal information. It's a very heavy burden that it's so attenuated. And we don't know that. Why isn't this an inevitable discovery case rather than an attenuated burden? Well, simply because what the government was afraid of, that Mr. Martinez Rodriguez would stop somewhere, unload the illegal contraband that he had, and when he was stopped, he wouldn't have anything. And, in fact, they think that that's what he was doing when he turned into Salem. I notice that my time has come to expire. Thank you. Thank you. May it please the Court, Kelly Zusman, appearing on behalf of the United States. Defense counsel just told you that it was entirely speculative that the officers could have assembled a team in time to intercept Mr. Martinez Rodriguez. And that's inaccurate. In fact, the district court's fact-finding that they would have been able to find him anyway is supported by Deputy Shadrin's testimony, and that's at SCR 47. She said, in answer to Judge Watford's question, that if, in fact, they hadn't received the precision location information from AT&T until after the defendant had crossed the Oregon border, she testified she would have been able to assemble a team and intercept him. And in terms of how likely was it he was going to be coming in on I-5, we also have Deputy Shadrin's testimony that, at this time, most of the methamphetamine that was coming into Oregon was produced in Mexico, and it was coming up I-5. So it was not a surprise that he would be entering from California into Oregon on I-5. So Judge Jones's determination that there was sufficient attenuation because there was simply no link between the monitoring they were doing in California and ultimately the stop that took place here in Oregon, 250 miles and four and a half hours after he crossed the border. We also have another significant intervening event, and I think this one may fall more along the lines of the inevitable discovery as opposed to attenuation, but that's the traffic stop. There is simply no question, based upon the findings that the court made, that Mr. Martinez-Rodriguez made an illegal turn. Therefore, it was perfectly permissible for him to be pulled over. I actually think it runs in the other direction. I don't understand. I mean, I generally work. The whole attenuation standard is so vague and mushy that I find it difficult to deal with. I don't understand why this isn't better looked at as an inevitable discovery stop, but I think the traffic stop goes to attenuation, not to inevitable discovery. Well, regardless, though, the traffic stop is certainly an independent, legitimate basis for the stop. It was fine, but it was manufactured. We all know that. It wouldn't have occurred otherwise. It just seems irrelevant to me. The traffic stop? It wasn't a manufactured stop. We know it was a manufactured stop. Well, but we know under Wren that their subjective motivations don't matter. I understand that, but you can't all of a sudden look at it as independent. I said it wasn't independent. It was completely not independent. Oh, well, it was certainly, if you simply look at the basis for the stop, the trooper saw an illegal turn. It was perfectly acceptable for him. It was perfectly acceptable, but it wasn't independent. Oh, but it doesn't have to be. Again, I mean, for purposes of attenuation, so long as we have a valid stop, we have a valid traffic stop because of a traffic violation. Something I regard those stops as, they're manufactured, they are made up in order to accomplish the same end. I don't think they do anything to either attenuate or have an independent cause or anything else. But on the other hand, the fact that there is a finding, which is hard to quarrel whether this would have happened anyway, is a completely different matter. And I'm just curious about why the government and the court chose the attenuation approach rather than the inevitable discovery approach. I think it was the one that we thought, at least we thought at the time, that these circumstances more closely than inevitable discovery. Regardless of what you're saying, the finding is a finding of inevitable discovery, isn't it? It would have happened anyway. Again, I think they're closely related concepts, and so my answer is yes. Whether it's through inevitable discovery or attenuation, I think there's no question here that even with the California monitoring, that they would have pulled him over. You take that out of the equation, and we know for at least two independent reasons they were going to pull over his car. And then we also know that everything that took place after that traffic stop, there's no dispute that that was a legal, lawful search that took place because of the dog alert that occurred within the confines of the traffic stop itself. I also wanted to address a point that Judge Watford, you made about what could they have done in the alternative here. And I think that it's a bit of a conundrum. They obtain a warrant from a state court judge to intercept this precision location information.  So, I mean, AT&T, pursuant to the terms of the warrant, is directed to provide them with the information. So I don't think that the defense counsel's suggestion that simply telling AT&T don't send us this stuff until after he enters Oregon is a decent answer, in part because then we're really simply delegating to AT&T what the agents would otherwise be doing. So I think we'd still have the same team question. The warrant itself doesn't specify, only send us what comes in after he enters the state. It says send all information provided by the cell site provider for 30 days. We also know that the monitoring that took place here differed radically. All they were doing when he was in California was checking to make sure when he came into Oregon. Once he entered Oregon, that's when this team... I'm sorry? They did, but we agreed not to use that. The only thing that they did with that, though, was it gave them greater confidence that they had the right phone. Again, we agreed, take that completely out of the equation, and nevertheless, the only reason that they were monitoring him in California was to determine when he came back into Oregon. We had testimony from Detective Shadran that neither she nor any member of her team ever entered California. The entire investigation that Deputy Shadran undertook, the physical surveillance didn't kick in until he crossed back into Oregon. And so for that reason, again, many of the factors that the district court was looking at, I think that the deputy here was attempting to comply with the terms of the warrant that gave her jurisdiction within the state of Oregon to investigate this case. What about the second issue, the sentencing issue? What evidence is there to support that the district court surmised that he was, in fact, going to be selling the drugs himself, rather than it was simply a card? And I think the district court's comments... I think there's not much, hardly anything. And frankly, there's not much either way. I mean, we had defense counsel told the court... But whose burden is it at that point? Well, there was no question about the drug quantity itself. And we didn't seek a role enhancement. Okay, but the judge essentially gave one. In the sense that he relied very heavily on his understanding, his insistence that this guy was not a carrier. I mean, there's a sort of interesting question about what kind of fact review we do when this is being used for 3553A factors. It's not being used for a guidelines determination or an enhancement. But it cost him, I don't know, 90 months or something. Well, what he got was a guideline sentence based upon the fact that he had 22 pounds of methamphetamine. But distinctly and specifically based on a finding that he was in fact the dealer. Well, and if I may, the context within which this arose was the defense asking the court to make a downward variance based upon his minimal role, if you will, and their suggestion that he was a courier. So I take issue with the notion that it's somehow the government's burden to prove that he was not a courier. This was a request for a downward variance by the defense. What Judge Jones did was he looked at that and he said, okay, you tell me that he was expecting a fee for this, but I don't see any evidence of that. And what Judge Jones found most persuasive was the fact that Mr. Martinez Rodriguez was able, just six months after his release and removal from the United States, was somehow able to work a deal where he is actually carrying 22 pounds of methamphetamine. The quantity of drugs suggests that he was not, in fact, simply a small player. We know that he had been selling half-ounce quantities in Canby. So I think certainly — Counsel, that's the extent of the evidence that there is to support that, though, because then the judge goes on and says that this is how he's making his living and assumes a higher standard of living, but he doesn't have a high standard that anybody can point to, correct? So what you're pointing to is the only evidence, and that's the record of the amount and the timing coming out of custody. Would that be it, Counsel, looking at everything that we have on the sentencing? That's correct. And the judge drew the inference from that. That inference? Okay. And the other point about his financial status, if you will, is, again, I go back to the context, which is that this is the defense asking for a downward variance, and yet the defense failed to come forward with answers to the probation office's questions about his financial information. So the court was left with a void there. And then the only issue is whether or not Judge Jones abused his discretion by not — He gave a low-end guideline sentence. Correct. And then — so given that, the only question is, did he in some way abuse his discretion by failing to make a downward variance based upon the absence of additional aggravating information? And here, I just think Judge Jones made a fair appraisal of the evidence before him and imposed what was ultimately a fair sentence. Unless there are any further questions, the government would submit. Thank you. I don't think it's simply a question of abuse of discretion. The court is tasked with the necessity to make factual findings out of sentencing. And as the questions from the court indicate, the judge made some pretty outlandish comments, which were not at all supported in the record by any facts. The government's own informant showed that this was a dealer of small quantities, one-half-ounce deals. He had no money. He had no visible means of support other than his roofing jobs. Testimony was presented that that was the case. He lived modestly with his wife's mother in an apartment. He didn't even have a working car. He had to borrow his sister's car for this trip to California. So to think that he was someone who could somehow front or guarantee three-quarters of a million dollars of an investment in drugs and then somehow sell it in half-ounce quantities for the foreseeable future is a much less reasonable conclusion of the facts than that he was simply a courier or a mule, which is what we see all the time in these big drug cases, where there's a large quantity and some poor Joe is out there taking the fall for the people who are really going to be taking the money, making the money. I wanted to just address briefly the court's question again about inevitable discovery. Inevitable discovery requires that they would have seized the contraband anyway. And the problem here- Which is exactly what was found here. Pardon? Which is exactly what the finding was. Well, the finding was that they could have put together the team anyway. I question that. I question they would have been able to do it as quickly. And here we have a situation where they had left the freeway. They were in a residential neighborhood. The government, in fact, was afraid that what they were just about to do was stop and unload the contraband. And so they were minutes away from doing that at the time they were stopped, according to the government's own supposition. And so it was hardly inevitable that if there had been any delay at all in them being able to catch up with this procession up the state of Oregon, that they would have found the contraband, which is, of course, the bottom line here. Okay. Thank you very much. In case of United States v. Martinez, we're going to revisit this a minute.
judges: Berzon, Watford, Sammartino